1

2                    **UNITED STATES DISTRICT COURT**
                    **WESTERN DISTRICT OF NEW YORK**

3

4    UNITED STATES OF AMERICA,        )
                                      ) Case No. 1:15-CR-00157
5                                     )              (RJA)(HKS)
                      Plaintiff,      )
6                                     )
     vs.                              ) June 2nd, 2016
7                                     )
     COREY KRUG                       )
8                                     )
                      Defendant.      )
9

10

                      **TRANSCRIPT OF ORAL ARGUMENT**
11           **BEFORE THE HONORABLE RICHARD J. ARCARA**
               **SENIOR UNITED STATES DISTRICT JUDGE**
12

13
     APPEARANCES:
14
     For the Plaintiff:    WILLIAM J. HOCHUL, JR.
15                         UNITED STATES ATTORNEY
                           BY:   JOHN FABIAN, ESQ.
16                         ASSISTANT UNITED STATES ATTORNEY
                           138 Delaware Avenue
17                         Buffalo, NY 14202

18   For the Defendant:    CONNORS & VILARDO, LLP
                           BY:   TERRENCE M. CONNORS, ESQ.
19                         1000 Liberty Building
                           424 Main Street
20                         Buffalo, NY 14202

21   Court Reporter:       MEGAN E. PELKA
                           Robert H. Jackson Courthouse
22                         2 Niagara Square
                           Buffalo, NY 14202
23

24

25

1           THE CLERK:  Criminal action 2015-157A.  United States

2    vs. Corey Krug.  Oral argument on defendant's objections to

3    report and recommendation of Magistrate Judge Schroeder.

4    Counsel, please state your name and the party you represent

5    for the record.

6           MR. CONNORS:  Good morning, Your Honor.  Terrance M.

7    Connors appearing for Corey Krug.

8           MR. FABIAN:  John Fabian on behalf of the government.

9           THE COURT:  All right.  Mr. Connors?

10          MR. CONNORS:  May it please the Court, I start

11   today's argument with a proposition that the primary guarantee

12   against the bringing of stale and untimely criminal charges is

13   the Statute of Limitations.  I concede that for purposes of

14   this argument.

15          But as the cases tell us, specifically in 1971, the

16   *Marion* case and six years later in the *Lovasco* case, the

17   Supreme Court stated in both of those cases that the Statute

18   of Limitations may be the primary guarantee, but it's not the

19   only guarantee.  Due process plays a role in determining

20   whether or not an individual should be subjected to an

21   oppressive delay, compromising the ability to defend and

22   causing prejudice.

23          THE COURT:  Okay.  Mr. Connors, the -- first of all,

24   I think there's two basic considerations here and that is one,

25   are your clients prejudiced and number two, was the delay

1    intentional by the government to gain a tactical advantage

2    over defendants.  Now, I think the government has pretty much

3    conceded the first point.

4           MR. FABIAN:  Your Honor, there is certainly some

5    prejudice in all parties in a case where there's a significant

6    delay.

7           THE COURT:  I think that's -- from what I can see

8    here, witnesses are missing, evidence has been missing.

9    There's a lot of factors here that would clearly seem to

10   satisfy the first requirement and I don't think you can

11   disagree with that.

12          MR. FABIAN:  There are certainly some bases for the

13   finding of prejudice.

14          THE COURT:  The point on this issue is, was the

15   government delay, was it intentional to gain a tactical

16   advantage?  I think that's the critical issue here,

17   Mr. Connors, because I don't think that -- the first part, I

18   think you certainly have met that.

19          MR. CONNORS:  I think you're right, Your Honor and

20   you've identified an issue that was the subject of quite a bit

21   of discussion before the magistrate.  As it turns out, I think

22   I can shed some light on that issue.

23          Back as early as 2002, the City of Buffalo was one of

24   nine cities that engaged in lengthy discourse with the

25   Department of Justice.  The reason for that discourse was that

1   the Department of Justice had instituted a review of practices

2   and procedures in nine cities and one state.  Buffalo was one

3   of them.

4          It started out that they would look at the use of

5   pepper spray, but it expanded into an examination of use of

6   force; policies, procedures, complaint forms, reporting

7   abilities.  And essentially what happened is that the

8   Department of Justice worked out an arrangement through a

9   reviewer who is appointed, an independent reviewer, where they

10  would report to the Department of Justice on a regular basis.

11  It started quarterly and maybe went a little but longer than

12  that during the course of the lengthy agreement.

13         So, what happened is that the Department of Justice

14  had access to all of the complaints of use of force.  Now, you

15  know, in this particular situation, the complaints go back all

16  the way to 2010; four years, 364 days before the statute was

17  to expire.

18         So, really, our position is this:  It's one of those

19  unique situations where the Department of Justice had access

20  to all the complaints.  That's undisputed.  We give them the

21  agreements.  No one has really ever contested the fact that

22  they had this information.  And what happened is, there's an

23  unexplained delay, unjustified delay as the cases call it,

24  because essentially what the Department of Justice did is they

25  cataloged all of these use of force complaints, looked at

1    them, reviewed them and declined to move further with civil or

2    criminal actions.  So, as a result of that and that

3    cataloging, they -- you know, it's interesting.  I'm not

4    trying to impose upon the government a duty to prosecute at

5    any particularly time, but what I am trying to impose and what

6    I think the cases support me on, is that you can delay the

7    prosecution of those cases, but you do it at your own peril.

8             If you wait four years and 364 days because you think

9    it's going to gain a tactical advantage for you because if you

10   cumulate these use of force complaints, it makes stronger

11   evidence.  Everyone will concede that three cases are stronger

12   than two cases, are stronger than one case.  So, what they did

13   is they declined to take any action that was --

14            THE COURT:  You're assuming they knew about these two

15   incidents though, right?

16            MR. CONNORS:  Well, I am inferring knowledge on the

17   part of the Department of Justice because of the exchanges

18   that took place pursuant to a documented agreement.  So, they

19   could have pursued them.  The district attorney could have

20   pursued them.  And one of the cases that I cited in our brief

21   talked about coordinate arms of law enforcement; that one

22   can't bounce the obligation back from one court from one law

23   enforcement agency to the other.

24            Basically, it's there and what happens is, they do

25   nothing.  There's not even an attempt to explain the delay.

1    When we argued this down below, there was no claim of, we were

2    doing a lengthy investigation because investigative delay has

3    been held to be a reason.

4         THE COURT:  Well, my understanding is the government

5    is claiming that they did not begin investigating your client

6    until the Thanksgiving incident in 2014 and when they got the

7    reports from the Buffalo Police Department, that was the first

8    time that they became aware of those two other incidents which

9    are in Counts 3 and 4.

10        MR. CONNORS:  Well --

11        THE COURT:  Or -- I'm sorry, not Count 3 and 4,

12   Counts 1 and 2.

13        MR. CONNORS:  One and two, yeah.  They have not said

14   that directly, but they do imply that they didn't have

15   knowledge and their investigation started later, but what they

16   have never responded to in any of the documents that I have

17   submitted is the fact that the knowledge was inferred because

18   of this agreement where they were supposed to look at

19   documents.

20        We know from the exact wording and language in the

21   agreement that they were forwarded to the Department of

22   Justice.  In some instances, extensions were requested to

23   extend the time for investigating and responding.  We know

24   that there was a reporting system and a tracking system for

25   all these complaints.

1          So, what I'm saying, Judge, is that the government

2   cannot just put their head in the sand and say, okay.  You,

3   City of Buffalo, have to report all of these use of force

4   complaints to us pursuant to an agreement, but we're not going

5   to do anything about them until we see fit.  And if they

6   decide to do it four years and 364 days later, that is for a

7   distinct tactical advantage.  There's no other reason and no

8   other explanation has been offered and it's logical.

9          I mean, it's logical that they would say, all right,

10  now we have this one case that occurred on Thanksgiving which

11  we believe is a defensible case and was a proper exercise of

12  force under the circumstances, so let's attach two other cases

13  that we never prosecuted, we never decided to prosecute, was

14  just left in abeyance because now we're going to get an

15  advantage.  We're going to load up, as the cases say, the

16  distinct risk of having the jury think that Corey Krug is a

17  thug, that he's a rogue cop, because they take these old

18  cases.  That's clearly a tactical advantage.

19          THE COURT:  What would you say if the Court severed

20  those two?  What would be your position on it?

21          MR. CONNORS:  You make a good point, Judge.  At my

22  oral argument in front of Magistrate Schroeder, he said to me,

23  well, Terry, that's what the motion for severance is for.  I

24  would say this, though:  Severance doesn't address the due

25  process argument.  Severance doesn't address the fact that

1   these cases were just left in abeyance for four years and

2   seven months, four years and 364 days.  And so, to revive them

3   now and to bring a prosecution for them is very, very unfair

4   and it's a fundamental fairness question because that's what

5   due process is; especially when, as we've identified, we've

6   lost witnesses, we've lost documents, we've lost our ability

7   to recreate certain manuals and procedure.  We've identified

8   six areas of prejudice.

9          So, I don't believe they should be allowed to take

10   these cases and they shouldn't be allowed to reinstate them.

11          THE COURT:  All right.  What is your position,

12   Mr. Fabian?

13          MR. FABIAN:  Your Honor, first of all, as the

14   defendant conceded, the primary protection against delay is

15   from the Statute of Limitations.  The Statute of Limitations

16   serves a purpose.  Second of all, as --

17          THE COURT:  You made it by two days on the one count.

18          MR. FABIAN:  We did.  That's correct, Your Honor, but

19   we did.  There is a time set forth in the Statute of

20   Limitations.  Second of all, to establish a due process

21   violation, which the defendant is attempting to do here, first

22   of all, he bears the heavy burden to establish the violation.

23   So, he has a heavy burden to establish the two prongs that

24   Your Honor identified.  The one we're focused on now, of

25   course, is whether there was an intentional or deliberate

1    delay.  He bears the heavy burden to prove there was an

2    intentional or deliberate delay.  He's not done so.  He's

3    asking Your Honor to make an inference without proof.  The

4    government has offered the explanation as Your Honor noted

5    that the criminal investigation began after the Thanksgiving

6    incident.  That's when the United States became aware of the

7    incident from a criminal perspective and began -- then

8    they've --

9         THE COURT:  What about all this review that was going

10   on since 2002?

11        MR. FABIAN:  That was done by the civil division.  As

12   Judge Schroeder noted in his report and recommendation, that

13   was done by the civil division and a separate group.  There's

14   no imputed knowledge.  There was no knowledge -- Your Honor,

15   to find there was an intentional or deliberate delay, you

16   would have to say that the government knew about those events

17   in 2010 and/or 2011 and then --

18        THE COURT:  Mr. Connors says that either they knew

19   about it or should have known about it.

20        MR. FABIAN:  That's what he says.  They did not know

21   and he bears the heavy burden to show there was an intentional

22   delay and you would have to find that we -- you would have to

23   infer that proof that we knew that and that at that time we

24   said, well, let's wait and see if something else happens later

25   down the road.  So, we're going to intentionally delay and

1  maybe down the road something else will happen and we'll

2  indict that. There was no intentional delay. I mean, you

3  have to evaluate it from that point in time from when the

4  delay began. You have to say there was a deliberate decision

5  for a tactical advantage not to proceed then and to proceed

6  later. There's no evidence for that. There's no basis for an

7  inference of that.

8        THE COURT: All right. Let's go to the next issue,

9  the motion to dismiss based upon the Grand Jury taint. I

10  think that's the next issue to address.

11        MR. CONNORS: Yes, Your Honor. The federal Grand

12  Jury was empanelled in this case on May 8th, 2015. It was

13  empanelled to consider evidence regarding the incident

14  involving Marcus Worthy of August 29th, 2010; the arrest of

15  Daniel Rashada on February 4th, 2011 and the November 27th,

16  2014 incident that occurred six months prior to the empaneling

17  of the Grand Jury.

18        So, while this Grand Jury is sitting and listening to

19  the testimony, while they're trying to decide the case in an

20  unbiased, impartial manner as they are obliged to do under

21  their oath, the government decides to file a criminal

22  complaint. And they file a criminal complaint not on the

23  stale, untimely cases, they file the complaint on the one that

24  just happened six months earlier. There is no basis for the

25  filing of that complaint. The Grand Jury is pending. It's

1    not a situation where we run into occasionally, Your Honor,

2    where a criminal complaint is filed and the matter is

3    submitted to the Grand Jury.  This Grand Jury is deliberating

4    right now to decide whether or not there is reasonable cause

5    to believe that a crime has been committed.

6          So, we get a complaint, a lengthy complaint, mass

7    media press conferences, press releases that are talking about

8    this while this jury is deliberating.  It doesn't make sense.

9    Why would they do something like that; other than to convey to

10   the Grand Jurors, regardless of what you think about the

11   probable cause, we think there is probable cause and here's a

12   lengthy affidavit that we've now filed publically and

13   conducted a press conference that says, we believe Corey Krug

14   is guilty of these crimes.

15         THE COURT:  How would you distinguish that, what

16   happened here, with the case *United States vs. Silver*?

17         MR. CONNORS:  I was actually involved in that case a

18   little bit and I was down there for some of the proceedings.

19   Here's how I would distinguish it.  Remember in *Silver*, Your

20   Honor, a situation that we frequently see where a criminal

21   complaint was filed initially, then the Grand Jury was

22   empaneled and they were asked to deliberate about it.  It's

23   not what we have here.  We have the reverse of that.  We have

24   a Grand Jury empaneled, evidence being presented and then they

25   file the complaint while the Grand Jury is pending.  The date

1   of the complaint it was filed was August 12th.  The Grand Jury

2   had been deliberating since May 8th, Your Honor.  There's no

3   reason why you should file that criminal complaint.  It just

4   defies credulity that they would do something like that while

5   the Grand Jury is pending.  There's no time limit involved.

6   They're not even close to the Statute of Limitations.

7           THE COURT:  I think -- and you can address this --

8   normally, if you file an indictment and it's bare bones, it

9   just states the statute, gives you a time and gives you,

10  basically, very little information except it's RICO cases or

11  conspiracy cases where they're very elaborate, you file a

12  complaint.  They can be affidavits that are 2 pages, 10 pages,

13  100 pages going to extraordinary detail as to what the case is

14  all about.

15          And sometimes, I said that I realize that the

16  complaint had been filed and it's, you know, maybe it's --

17  let's just -- like, I guess, maybe it's 50 pages, okay?  It

18  goes into great detail about the case.  The next day, an

19  indictment comes which charges the bare bones violation of

20  various statutes.  Why do you do that?

21          MR. FABIAN:  Your Honor, it's within the United

22  States' discretion to initiate the case with a complaint in

23  terms of the --

24          THE COURT:  What's the purpose of -- what do you --

25  other than to tell the world what the case is all about.

 1            MR. FABIAN:  Well, the public, you know, has a right

 2    to know the charges against the individual and then when, on a

 3    case-by-case basis --

 4            THE COURT:  I suppose you could do that in every

 5    single case; file a complaint and then indict the same day?

 6            MR. FABIAN:  Absolutely you could, Your Honor.

 7            THE COURT:  Because you go into more detail, but what

 8    is the advantage to the government to advise the public of

 9    what the case is all about?

10            MR. FABIAN:  That's one legitimate basis.  Another is

11    that sometimes filing a complaint will start the process.  It

12    can begin the process of --

13            THE COURT:  Well, this case here, you've got the

14    Grand Jury investigating it.

15            MR. FABIAN:  Correct.

16            THE COURT:  And while they're investigating, you have

17    a complaint filed.

18            MR. FABIAN:  Which can start plea negotiations.  It

19    can be a marker in that --

20            THE COURT:  What's the time difference between the

21    Grand Jury starting the investigation and the time the

22    complaint was filed?

23            MR. FABIAN:  In this case?

24            THE COURT:  Yeah.

25            MR. FABIAN:  I believe the Grand Jury was empaneled

1   May 8th and the complaint was filed August 12th, so three

2   months and four days.   The indictment was the first

3   indictment.

4          THE COURT:   This was to aid in plea bargaining, is

5   that what you said?

6          MR. FABIAN:   I'm not -- I'm not -- I did not make the

7   decision to file the complaint in this case, but that is

8   certainly one of the bases for filing a complaint.   But let me

9   step back, Your Honor.   I mean, as to the issue before the

10  Court here, the question is, did the -- again, on this issue,

11  the defendant has a burden to show the government's use of the

12  Grand Jury was proper.

13         Grand Jury proceedings are accorded a presumption of

14  regularity.   There can be error only if there's a showing of

15  actual prejudice to the Grand Jury that the Grand Jury's

16  decision was substan3tially influenced by some improper

17  conduct.   There's no such showing here.   There's no showing

18  the Grand Jury --

19         THE COURT:   The strongest case you have to support

20  yourself is *U.S. vs. Silver*, I assume?

21         MR. FABIAN:   *Silver* is certainly --

22         THE COURT:   Mr. Connors comes up with a -- why that's

23  different, why the factors are different there.   How do you

24  address that?

25         MR. FABIAN:   Well, Your Honor, *Silver* was a -- I

1  believe there was a complaint with a 35-page affidavit.

2  Unlike in *Silver*, I mean, the U.S. Attorney in that case, I

3  believe, appeared on MSNBC the day or two after filing a

4  complaint.  He was -- had some speaking engagement at a forum

5  where he addressed at length that *Silver* case.  There were

6  some statements, although qualified, that there were --

7         THE COURT:  The Court wasn't too happy about that.

8         MR. FABIAN:  The Court was not too happy.  But

9  ultimately, they found that even if those -- even if that

10  conduct was improper or possibly the basis for an ethical or

11  other inquiry, it was not a basis for dismissing the

12  indictment because there was no showing that the Grand Jury's

13  decision to indict --

14         THE COURT:  Did that issue go to the Second Circuit?

15         MR. FABIAN:  It did.  It quoted a case called *Noonan*.

16  It also quoted a case called *Myers*; both of which addressed

17  pretrial publicity.  And so, it was relying on -- *Silver* was

18  relying on Second Circuit precedent in reaching its

19  conclusions to the matter.

20         Simply put, even in cases where there is substantial

21  pretrial publicity and overwhelming pretrial publicity, the

22  Grand Jurors are -- in one of the cases, *Noonan* says Grand

23  Jurors are allowed to read newspapers articles and decide to

24  act on that; unlike a petit jury or a petite jury which is

25  supposed to be not influenced by any outside sources, the

1    Grand Jury may.

2            THE COURT:  Mr. Connors?

3            MR. CONNORS:  Judge Caproni did not give him a free

4    pass on that.  She took him to task in the opinion and found

5    the claim to be a meritorious claim.  But the difference, of

6    course, is that what the U.S. Attorney in the Southern

7    District did not do was to send out all of those messages

8    while his Grand Jurors were debating the case; deliberating on

9    whether or not to issue an indictment.

10           That's what makes this case different and that's what

11   make it worse.  And I would be willing to suggest that Judge

12   Caproni would look very harshly at what was done in this

13   particular case also, because in addition to the criminal

14   complaint, there were a flurry of media reports broadcast and

15   print and it was everywhere.

16           It's just an unfair tactic and frankly, there's never

17   been a proffered reason to justify that.  Seriously, Judge,

18   plea bargaining?  Plea bargaining?  That would be the reason

19   why they did that?  That's no reason that's been offered to

20   the Court.

21           THE COURT:  All right.  Why don't we take a five-

22   minute break and we'll pick up on the motion to dismiss Count

23   2 of the superseding indictment.  We're talking about the

24   flashlight and whether it's an instrument and then, we'll pick

25   up on the motion to suppress the statements and I believe the

 1  last one will be the severance, okay?  We'll take a five-

 2  minute break.

 3          THE CLERK:  All rise.

 4  (Brief recess)

 5          THE CLERK:  All rise.

 6          THE COURT:  Okay.  Mr. Connors, the motion to dismiss

 7  Count 2 of the superseding indictment.

 8          MR. CONNORS:  Yes.  I acknowledge, Your Honor, that I

 9  am on the low side of this argument.  I've read the *Gray* case

10  that was provided to me by Jack Rogowski and I don't wish to

11  withdraw the argument, but I understand that his position is

12  that the federal government is, in fact, an agency that can

13  review conduct by the Buffalo Police Department.

14          When I first looked at the claim and I looked at the

15  statute, I saw that it required a federal nexus and *Gray* talks

16  about the federal nexus and suggests that it's enough to

17  allege that there is contact between the Buffalo Police

18  Department and the U.S. Attorney's office as prosecuting

19  authority for these types of cases.

20          I still believe, though, that it's a deficient count.

21  I believe it's facially deficient and I believe also that the

22  allegation with respect to the "impact weapon" is deficient,

23  but I'm not --

24          THE COURT:  That's when the flashlight is a weapon?

25          MR. CONNORS:  Yes.

 1          THE COURT:  What do you think about that?  Is that a

 2   fact question for a jury?

 3          MR. FABIAN:  Absolutely, Your Honor.

 4          THE COURT:  How do I charge the jury?  What do I say

 5   to the jury?

 6          MR. FABIAN:  Your Honor will charge the -- the jury

 7   will obviously -- the jury will have read the indictment, read

 8   that an impact weapon has been charged and Your Honor will

 9   give an instruction -- some instruction along the lines of

10   that's a matter of fact for the jury to decide whether the

11   evidence presented to the Court in the trial on the basis --

12          THE COURT:  I'll have to explain to them what a

13   weapon is.  What is it?  How am I -- what am I going to say to

14   the jury in defining -- they need a guide.

15          MR. FABIAN:  Right.  Well --

16          THE COURT:  What do I tell them?

17          MR. FABIAN:  Your Honor can define weapon and what's

18   a weapon as set forth in our motion.  Webster's defines what a

19   weapon is --

20          THE COURT:  What does Webster's say?  You quoted it.

21          MR. FABIAN:  We did, Your Honor.  A weapon is --

22   Webster's defines a weapon as something used to injure, defeat

23   or destroy.  And a large flashlight is --

24          THE COURT:  Is that the definition I'll give the

25   jury?  What are the -- what does the statute say or what does

1   the legislative history say?  What do they -- give me some

2   guidance as to what a weapon is.

3            MR. FABIAN:  Your Honor, I have not evaluated

4   legislative history as to the definition of impact weapon or

5   whether that would be --

6            THE COURT:  The pattern jury instructions, what do

7   they say?

8            MR. FABIAN:  I have not gotten to the point of

9   defining what jury instructions are, but I do believe that

10  it's an issue of fact --

11           THE COURT:  You understand that the Court, if I agree

12  with your position, that I'll have to give very helpful, you

13  might say, instructions to the jury, so they'll be able to

14  decide the fact question of whether or not a flashlight is a

15  weapon.  You can't just throw -- you decide what a weapon is.

16  That's not good enough.  We have to go into a little more

17  detail.  I assume you'll be prepared to do that if I go along

18  with your argument in this case?

19           MR. FABIAN:  Absolutely, Your Honor.  The government

20  will consult with the defense if necessary or provide its

21  own suggestive instructions --

22           THE COURT:  Well, the defense is not going to help

23  you out on that.  The defense is going to tell you clearly

24  it's not a weapon.

25           MR. FABIAN:  But we usually consult with one another

 1    on the jury instructions.

 2         THE COURT:  All right.  We'll go from there.

 3         MR. CONNORS:  The reason I moved to dismiss that

 4    count is just as you pointed out.  I did not think there was a

 5    sufficient guide in the Grand Jury to establish that.  Impact

 6    weapon is a term of art.  It's a gun.  It's an asp.  It's a

 7    baton, those types of things.

 8         A flashlight is something that an individual officer

 9    buys by himself or herself and I just didn't think that there

10    would be sufficient evidence before the Grand Jury to

11    establish that it was an impact weapon and therefore, the

12    count should be defective.  I didn't think they had a guide to

13    tell them what, in effect, is a weapon.

14         THE COURT:  What was the length of this flashlight?

15         MR. FABIAN:  I believe it was 12 inches.

16         MR. CONNORS:  Twelve inches.

17         THE COURT:  This big (indicating)?

18         MR. FABIAN:  Correct, Your Honor.

19         THE COURT:  Is that about 12 inches?

20         MR. FABIAN:  I can't see it from here, but that looks

21    approximately accurate, Your Honor.

22         THE COURT:  You can't see this (indicating)?

23         MR. FABIAN:  I mean, I'm not close enough to

24    specifically evaluate whether that's 11 or 13 inches, but it

25    looks close, Your Honor.

1          THE COURT:  Now we're going to deal with the motion

2    to suppress the statements.  Mr. Connors?

3          MR. CONNORS:  In the *Garrity* issue that was argued

4    before Magistrate Schroeder, we made a request that the

5    government provide us with information as to what happened to

6    the documents from the point of subpoena until the point of

7    tainting as they represented.  Magistrate agreed with me and

8    directed the U.S. Attorney to provide such an affidavit.

9          We just discussed that and they're going to provide

10   me with that affidavit so they'll be able to make a

11   determination as to whether there's a basis for a *Garrity*

12   application.

13         THE COURT:  All right.  When is that going to be

14   done?

15         MR. FABIAN:  Your Honor, I'll get that taken care of

16   with deliberate speed.  I'll just give the information, get an

17   affidavit put together.  It should not take much time to do.

18         THE COURT:  All right.  Well, I don't want to leave

19   that open-ended.

20         MR. FABIAN:  If Your Honor can give me within the

21   next two weeks?

22         THE COURT:  Two weeks?  All right.  And then, I don't

23   know, Mr. Connors may decide just to agree with you or say

24   well, no, that needs further argument.  I don't know.

25         MR. FABIAN:  I think that sounds fair.

1         THE COURT:  What we'll do is two weeks to file those

2    papers and then, we'll give Mr. Connors two weeks to respond

3    and then, I'll either consider it submitted or if I feel that

4    further argument is necessary, I'll -- on that issue alone,

5    I'll set a tentative argument date.  I'll set it today.  Let's

6    say about a week or two later.  This case is -- it's not too

7    old.  It's a 15.  So, we're talking two weeks.  We'll put

8    it -- let's get dates.  Two weeks.  What's two weeks from

9    today?  Whatever.

10         THE CLERK:  So, that will be -- the government's

11   affidavit is due June 16th.

12         THE COURT:  And two weeks after that?

13         THE CLERK:  That's June 30th is two weeks after that.

14         THE COURT:  Okay.  We'll set argument -- if -- a

15   tentative argument, we'll put it that way.  I'll respond when

16   the papers have been filed whether argument is necessary or

17   not.  If it is, we'll set a tentative date now.  This is just

18   tentative.

19         THE CLERK:  Two weeks?

20         THE COURT:  Two weeks.

21         THE CLERK:  July 14th at 9 o'clock.

22         THE COURT:  Okay.  That's tentative, okay?  Just so

23   we can make sure everyone's calendar is clear.  I don't think

24   it will be an extensive argument if there's going to be

25   argument at all.  Okay.  The next thing I think we have to

 1   deal with is severance.

 2              MR. CONNORS:  It is, Your Honor.

 3              THE COURT:  All right.  Mr. Connors?

 4              MR. CONNORS:  Your Honor, we have sought severance of

 5   the counts of the indictment pursuant to Rule 8(a) and 14(a)

 6   under the criteria that exists for both of those.

 7              Rule 8(a) allows the government to join counts that

 8   are not part of a common transaction; counts that are

 9   essentially unrelated only under specific circumstances as

10   articulated in that rule.  And in this case, the government

11   has chosen one reason to join it.  They say that they're of

12   the same character, not based on the same active transaction,

13   no common scheme or plan, the same character.

14              Well, in looking at the research for those cases that

15   were decided under that particular section, you see a lot of

16   red flags; a number of warning signs as articulated by the

17   Second Circuit and the United States Supreme Court.  The case

18   law is really interesting on this topic because they

19   distinguish that one ground, same or similar character.

20              And here's what they say, United States Supreme

21   Court.  They say essentially that the customary justifications

22   for joining same-character crimes largely disappear when

23   that's your only basis.  Efficiency and economy essentially go

24   out the window because of the risks and the other dangers in

25   joining those type of prongs and those type of allegations.

1   The disadvantage to which the defendant is put and the

2   potential danger he's exposed to from a joinder of those

3   offenses is easily understood, says the Supreme Court in

4   *Halper* and -- I'm sorry, the Second Circuit in *Halper* and a

5   District Court in the District of Columbia.

6          And they go on further to warn us about including

7   what is customarily categorized as propensity evidence.  What

8   they say is, the jury may use the evidence of one of the

9   crimes charged to infer a criminal disposition on the part of

10  the defendant from which his guilt is found for the other

11  crimes charged; exactly what I said was the tactical advantage

12  that the government sought by delaying the prosection; exactly

13  the problem that's created.

14         In addition, they talk about the less tangible but

15  perhaps equally persuasive problems that are caused by joining

16  same or similar character charges.  It's greater with respect

17  to these charges than any other types of counts properly

18  joined under Rule 8(a).

19         *Halper* says it's exactly that sort of a case where a

20  jury would be likely to cumulate the evidence of the various

21  crimes charged and find guilt when, if considered separately,

22  it would not do so, which is exactly the argument we made

23  under the delay, but it's even stronger now because of the

24  problem with the severance.  So, we think under those

25  circumstances and under that case law, Rule 8(a) would provide

1  us with a severance because the last thing you want to do,

2  Your Honor, is have evidence that's admitted to prove

3  disposition to commit crime.  This inference is so high under

4  those circumstances that the Courts presume there's prejudice.

5  And unless the government can come up with some substantial

6  reason, some basis for it -- and they have not proffered one

7  so far.  All they've said is, well, we think it's the same

8  type of a charge.

9        And Judge McMahon in the Southern District said, when

10  all that can be said on two separate offenses is that they are

11  the same or similar character, the customary justifications

12  for joinder, efficiency and economy, largely disappear.  He

13  said, the jury may consider that a person charged with doing

14  so many things is a bad man must have done something and may

15  cumulate the evidence against him and one offense can be used

16  to convict him of another, even when the proof is taken

17  together, it's not enough to convict of either.

18        They also talked -- and Judge McMahon talks about

19  jury instructions because their response is, well, there's an

20  instruction that the Court can give.  What they say about same

21  or similar character is, even when cautioned, juries are apt

22  to regard with a more jaundiced eye a person charged with two

23  crimes than a person charged with one.

24        THE COURT:  Mr. Fabian, what do you say to all that?

25        MR. FABIAN:  Your Honor, that's why Courts routinely

1    give limiting instructions in that -- limiting instructions in

2    that situation.

3            THE COURT:  Is there a difference between joinder and

4    severance?

5            MR. FABIAN:  There is, Your Honor.

6            THE COURT:  What is the difference?

7            MR. FABIAN:  Rule 8(a) is the rule addressing joinder

8    and essentially, it's -- the rule is liberally construed in

9    favor of joinder.  There are a variety of bases for joinder

10   where, you know, acts are part of the same act or transaction

11   or they're part of a common scheme or plan or like here when

12   the conduct is similar in nature, doesn't have to be too

13   precise in identity.  The crimes can be --

14           THE COURT:  That's the only reason why you say there

15   should be no severance here, because they're similar in

16   nature?

17           MR. FABIAN:  That's the provision of Rule 8(a) that

18   we're relying on in this case, Your Honor, yes, because counts

19   need only have a general likeness to each other.  We go far

20   more than that.  These are charged with the same crimes.  Like

21   Your Honor had the *McCabe* case a couple years ago, where the

22   defendant was charged with a variety of types of fraud of

23   different financial institutions, the first seven counts, I

24   believe, were -- involved mortgage fraud.  The other counts

25   involved fraud with auto and other loans is my understanding

1    and those are counts that are, under Rule 8(a), permissibly

2    joined, which is construed liberally, counts that have a

3    likeness to one another here.  It's not just a likeness, it's

4    the same crime.

5           Then, you've got, as to severance under Rule 14, the

6    defendant, again, I sound like a broken record but again, the

7    defendant bears the burden here.  They've got to establish

8    that a joint trial would cause substantial prejudice resulting

9    in a miscarriage of justice.  That's not established here.

10          Courts routinely try cases with multiple defendants

11   or one defendant with multiple crimes, you know, routinely.

12   And what's the correction for any potential spillover effect?

13   It's not severance, it's limiting instructions.  Courts

14   routinely give limiting instructions in this type of

15   situation.  In the *McCabe* case, Your Honor found --

16          THE COURT:  What would be the limiting instruction I

17   would give?

18          MR. FABIAN:  Your Honor would instruct the jury that

19   the multiple counts, they consider the evidence as to each

20   count separately.

21          THE COURT:  That's it?

22          MR. FABIAN:  Well, you can't use the -- in fact,

23   there's multiple counts to influence your decision on the

24   other counts, if you evaluate each count independently, just

25   as Your Honor instructed the jury to do in the *McCabe* case.

1   It's a very similar thing.

2           In that case, Your Honor found that the spillover

3   alleged could be found in every case involving a joinder of

4   counts and held a limiting instruction would be appropriate to

5   avoid spillover.  So, the exact same type of limiting

6   instruction applied in that case would be appropriate in this

7   case.  And of course, as the Supreme Court has held --

8           THE COURT:  What is the common evidence you intend to

9   submit to the trial?

10          MR. FABIAN:  Your Honor, there would certainly be

11  common witnesses that would testify about policies and

12  procedures and training with regard to the Buffalo Police

13  Department and use of force and both training as to how to use

14  use of force.  There would be training about what the proper

15  documentation and procedures in that situation are -- is.  As

16  set forth in our briefing, there may -- we have not decided

17  yet --

18          THE COURT:  You haven't what?

19          MR. FABIAN:  We have not -- as set forth in our

20  briefing, there may be an expert on use of force.  We haven't

21  decided whether to call --

22          THE COURT:  You need an expert?

23          MR. FABIAN:  That's what we're evaluating.

24          THE COURT:  What would the expert say?

25          MR. FABIAN:  The expert would testify about -- would

 1   give expert testimony on the use of force policies, how

 2   they're drafted and --

 3              THE COURT:  Where would this expert come from?

 4              MR. FABIAN:  Where would the expert come -- I don't

 5   know yet.  Your Honor, we've been consulting with the civil

 6   rights division in DC about, you know, talking about this

 7   issue.  Like I said, we don't -- we haven't decided --

 8              THE COURT:  We're going to have a battle of the

 9   experts here?

10              MR. FABIAN:  I don't think so, Your Honor, but it's a

11   possibility.  I mean, coming back, that's one potential

12   commonality.  Regardless, I mean, this is not distinct from

13   the routine case where counts are routinely joined, tried

14   together, judges use limited instructions, jurors are presumed

15   to follow their instructions.  There's no evidence -- there's

16   no meeting of the burden to show substantial prejudice

17   resulting in a miscarriage of justice.

18              THE COURT:  All right.  Mr. Connors?

19              MR. CONNORS:  It's absolutely distinct from that

20   commonplace situation you face in a multi-count indictment.

21   First of all, with respect to a curative instruction, that's

22   got to be given with consent of the defense.  That's a very

23   difficult call to make.  Many times, a curative instruction

24   just highlights the fact that there's additional charges.  So,

25   whether you even give that charge, Your Honor, would be

1    something would have to be discussed.  Secondly, this claim

2    about an expert witness, that's as weak as my claim saying I

3    should get severance because he may testify.  Neither of them

4    carry any water.  So, that doesn't make the day.

5              What does make the day and what they've never

6    responded to in their papers or in oral argument is this:  The

7    Court of Appeals admittedly, I believe it's the Tenth Circuit,

8    said the uncharged crime or act, because it's essentially a

9    404(b) analysis, must be close in time to the crime charged.

10   Close in time.  These things are four plus years apart.

11   They're not close in time under any circumstances.  They can't

12   possibly overcome that hurdle.

13             And secondly, in the case law from the Second

14   Circuit, the *Halper* case, this is why same character, same or

15   similar-character allegations are so dangerous.  We advise

16   prosecutors and trial courts to exercise caution with regard

17   to the joinder of same or similar-character offenses.  That

18   was the panel that had Judge Oakes, Griffon and Metzger and

19   the reason they do that is articulated in all the cases that

20   follow.

21             Of any type of a joinder of offenses, this is the

22   greatest peril to the defendant.  This is the greatest problem

23   that exists because of the chance that a jury is going to say,

24   listen, this is a bad person; not is he guilty of each and

25   every element on every count.  It's clearly propensity

1    evidence.

2          So, last night, when I was looking at some cases when

3    John had sent me his brief about issues in 404(b), I went and

4    I pulled six cases on 404(b) dealing with police officers in

5    the context of civil litigation and these six cases all say

6    inadmissible.  Don't do it.  Propensity.  Dangerous.

7          Admittedly, they were civil cases and I have actually

8    an extra brief on that.  I know you limited us to five pages,

9    but I do have a one-page brief that cites these cases that I

10   found last night that say it's clear you don't allow that kind

11   of evidence because of the danger, the harm, the inability of

12   an individual to get a fair trial and the likelihood that no

13   jury, no matter how well instructed, is going to be able to

14   overcome that feeling.

15         THE COURT:  I assume that you have no problem with

16   the 2010, 2011 being tried together?

17         MR. CONNORS:  I don't have a good argument for that.

18         THE COURT:  All right, gentlemen.  I'll consider the

19   matter submitted.  Thank you very much.

20         MR. FABIAN:  Your Honor, if I may correct --

21         THE COURT:  I'm not going to probably decide -- well,

22   I have to think about whether I'm going to decide this before

23   the briefing on the other one issue.

24         MR. CONNORS:  *Garrity*.

25         THE COURT:  If you can provide the information, I'll

1   have to figure it out.  It's all fresh in my mind right now

2   and I really don't -- sometimes, when you look at this stuff a

3   month later, it's not quite as clear as it is after oral

4   argument.  Thank you, gentlemen.

5          MR. CONNORS:  Thank you, Your Honor.

6          MR. FABIAN:  Your Honor, if I may, Your Honor, just

7   to correct myself on one point, a cleaning up matter.  You

8   asked if the *Silver* case had cited Second Circuit cases.  I

9   told you they cited *Noonan* and *Myers*.  *Noonan* was a Second

10  Circuit.  *Myers* is actually a District Court case.

11         THE COURT:  Okay.

12         MR. FABIAN:  I just wanted to correct myself.

13         THE COURT:  Okay.  Thank you.

14  (Proceedings ended.)

15

16

17

18

19

20

21

22

23

24

25

1                  *     *     *     *     *     *     *

2

3              I certify that the foregoing is a

4         correct transcription of the proceedings

5         recorded by me in this matter.

6

7

8

9                              s/ Megan E. Pelka

10                             Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25